Estate of Chris M. Neilson, deceased, Roman Belmont and Clifford C. Neilson, Co-executors v. Commissioner.
Neilson v. Commissioner
Docket No. 1235-66.
United States Tax Court
T.C. Memo 1967-219; 1967 Tax Ct. Memo LEXIS 41; 26 T.C.M. (CCH) 1086; T.C.M. (RIA) 67219; November 2, 1967
J. Ernest Brophy, 14 Franklin St., Rochester, N. Y., for the petitioner. Julian I. Jacobs, for *42 the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined a deficiency of $32,230.63 in estate tax. Certain issues raised in the pleadings were disposed of by agreement of the parties prior to the trial herein. The sole issue left for decision is whether the value of 100 shares of stock in C. M. Neilson & Son, Inc., and of three savings accounts is includable in the gross estate of Chris M. Neilson under section 2035. [1]
Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Chris M. Neilson (hereinafter referred to as decedent) died testate on September 10, 1962. He was survived by a daughter, Louise Neilson (hereinafter referred to as Louise), two sons, Clifford Neilson (hereinafter referred to as Clifford) and Clair Neilson (hereinafter referred to as Clair), and a step-son, Roman Belmont (hereinafter referred to as Roman). Decedent's will was admitted to probate by the Surrogate's Court of the County of Ontario, New York, on October 1, 1962. *43 Roman and Clifford are the duly appointed, qualified and acting co-executors of decedent's estate. A federal estate tax return for decedent's estate was timely filed with the district director of internal revenue at Buffalo, New York. Decedent was in business with his stepson, Roman. They sold and serviced International Harvester trucks, farm equipment, and light industrial equipment. Clifford, Clair, and Louise never participated in the business. Decedent and Roman originally operated their business as equal partners in a partnership, C. M. Neilson & Son (hereinafter referred to as Neilson partnership). Roman spent about half his time on managerial affairs of the partnership. He spent the rest of his time selling and servicing trucks and light industrial equipment. Decedent devoted all his time to selling and servicing farm equipment. Roughly half of his work involved physical labor. He was a pioneer in the farm equipment business and was well thought of in his area of operation. In May 1957, decedent and Roman created a corporation, C. M. Neilson & Son, Inc. (hereinafter referred to as Neilson corporation). Neilson partnership transferred to Neilson corporation all its business *44 assets except its real estate. In exchange, Neilson partnership received all the stock of Neilson corporation (150 shares of preferred, 200 shares of common). During 1959, Roman told decedent that he was thinking of taking his interest out of Neilson corporation. Roman did not like the farm equipment business. It required a high level of both inventory and receivables. Because he had to assume liability to International Harvester for the inventory, and because of the credit extended to purchasers, Roman was personally liable for about $130,000 to $140,000 of farm equipment at any time. Decedent asked Roman not to withdraw his interests from the corporation. He wanted Roman to stay because they had built the business together and because Roman took care of the management affairs. In 1960, Roman again expressed to decedent his desire to withdraw his interests from the Neilson corporation because of its continuance of the farm equipment line. Decedent again asked Roman not to leave the business. On October 5, 1961, decedent and Roman dissolved the Neilson partnership. The partnership transferred its real estate to a newly created corporation, 481 West Hamilton, Inc. Decedent and *45 Roman held all the stock of this corporation in joint tenancy with rights of survivorship. The partnership transferred its preferred shares of Neilson corporation to Roman. It transferred its common stock in Neilson corporation to decedent and Roman in joint tenancy with rights of survivorship. On the same day Roman and decedent, as joint tenants, transferred all the Neilson common stock to Roman alone. At least one purpose for the transfer was to encourage Roman to remain in the business. At the time of the transfer, Roman was 49 years old and decedent was 73 years old. After this change, Neilson corporation reduced the level of its inventory and receivables in the farm equipment line. Also, Roman stopped guaranteeing the corporation's indebtedness to International Harvester Company. Although the corporation cut back on its farm equipment line, decedent continued to work for it. In general, there was no outward change in the conduct of the corporation's business. [2]
On April 16, 1963, a gift tax return for the calendar year 1961 was filed for decedent by his estate. The transfer *46 by decedent and Roman as joint tenants of 100 shares of Neilson corporation common stock on October 5, 1961, to Roman alone was reported as a taxable gift. [3] The return showed no tax due because of decedent's specific exemption under section 2521. On June 6, 1950, decedent opened a savings account in the Geneva Savings Bank in Geneva, New York. The style of the account was "Chris M. Neilson in trust for Louise M. Neilson." The account is hereinafter referred to as the Geneva account. On January 9, 1956, decedent opened a savings account in the Syracuse Savings Bank in Syracuse, New York. The style of the account was "Chris Neilson or Louise Neilson, Either or Survivor may draw." The account is hereinafter referred to as the Syracuse account. On January 9, 1956, decedent also opened a savings account in the Onondaga County Savings Bank in Syracuse, New York. The style of the account was "Chris M. Neilson in trust for Louise Neilson." The account is hereinafter referred to as the Onondaga account. When decedent opened the above-described *47 accounts, he intended to irrevocably transfer money in trust for the benefit of Louise. The reason for the transfers was to protect Louise against eventualities. Louise was and still is mentally retarded. She was 20 years old when decedent opened the first account in 1950. In accord with his intention to make irrevocable transfers for the benefit of Louise, decedent never withdrew money from the accounts. In January 1957, decedent contacted Thomas J. Kleeman, a practicing C.P.A., to prepare his income tax returns. He prepared decedent's income tax returns for the years 1956 through 1962. He repeatedly advised decedent to report as his income the interest from the Geneva, Syracuse, and Onondaga's accounts. Decedent refused to do so, stating that he held the accounts in trust for Louise. The accountant told decedent that under the technical requirements of the law he did not hold the accounts in trust for Louise. He also told him that he could satisfy these requirements by creating a written, irrevocable trust. Pursuant to this advice, decedent created an irrevocable trust for the benefit of Louise on January 4, 1962. [4] The trust is hereinafter referred to as the Louise trust. *48 The trustees are Roman and Clifford with the major powers in Roman. Under the terms of the trust indenture, the trustees are to pay the income to Louise for her life. Roman, or in the event of his death, Clifford, has absolute discretion to invade corpus for Louise's benefit. At Louise's death, the corpus goes two-thirds to Clifford and one-third to Clair or to the issue of each per stirpes. The trust corpus consisted of the Geneva account, the Syracuse account, and the Onondaga account. The value of the corpus on the date of decedent's death was $27,964.55. On January 8, 1962, Roman closed the Syracuse and Onondaga accounts and transferred the funds into an account for the Louise trust. On the same day, he prompted the Geneva Savings Bank to change the style of the Geneva account to read "Roman Belmont and Clifford C. Neilson in trust for Louise M. Neilson." On January 17, decedent transferred additional funds into this account. On April 15, 1963, a gift tax return for the calendar year 1962 was filed for decedent by his estate. The creation of the Louise trust was reported as a taxable gift. It showed a tax due *49 of $1,629.36. On January 4, 1962, decedent executed a will. [5] The will provided for payments of debts and funeral expenses and made several minor specific bequests of money. The residue was given one-third to Clair, onethird to Clifford, and one-third to the Louise trust. Decedent's accountant never estimated and conveyed to him the amount of inheritance taxes that would be involved with his estate. For many years decedent had levitated, essential hypertension. This is defined as a chronic condition the symptom of which is fluctuations in blood pressure from normal to high without known cause. The condition was not serious. Decedent did, however, take daily medication to control it. In November 1950, decedent became a patient of George H. R. White, a practicing physician. At this time, decedent was hospitalized for bronchial asthma. He stayed in the hospital for a short period of time. Aside from bronchial asthma and hypertension, decedent was in good health in November 1950. He impressed his physician as a "good, sturdy, rugged individual." Decedent was over six feet tall and weighed 197 pounds. He was then 62 years old. Toward *50 the middle of 1956, decedent suffered acute attacks of gallstone colic, or abdominal pain, with jaundice, or yellowing of the skin. Decedent's condition was diagnosed as chronic cholecystitis with cholelithiasis, i.e., chronic inflammation of the gall bladder with formation of gallstones. To alleviate the condition, decedent had a gallstone operation on June 30, 1956, during which his gall bladder was removed. Decedent made a good recovery after the operation. After this operation and before 1960, decedent had a recurrence of gallstone trouble accompanied with jaundice. As a result, decedent had a choledocholithotomy, an operation in which stone is removed from the common bile duct. Late in 1959, decedent developed a right inguinal hernia. He had a hernia operation on December 27, 1959. He made a good recovery and returned to work thereafter. Decedent was hospitalized from about January 3 to February 20, 1961. When he entered the hospital, he had several disorders and symptoms, including acute urinary problems, chronic constipation, bloody discharge from the rectum, and a mass in the abdomen. After testing and observation, it was determined that he had an acute bladder inflammation, *51 a benign polyp in the large colon, a left inguinal hernia, and diverticultis. The latter is defined as a condition of having abscessed and inflamed pouches on the walls of the colon. Decedent had surgery during February 1961 in which his bowel was resected and the polyp was removed. His urinary difficulties were cured with medication. Decedent was 72 years old at the time. He made a good recovery and returned to work thereafter. In August 1961, decedent developed right hydrocele. This is a condition where a testicle swells because of fluid accumulations. Decedent recovered from this without hospitalization. He returned to work after recovery. On May 15, 1962, decedent had a problem with his blood pressure. This was accompanied by nose bleeding. As a result, decedent's medication for his high blood pressure was increased and his nose was cauterized. On May 18, 1962, decedent had a sharp rise in blood pressure, became generally weak, and developed difficulty in speaking. These were diagnosed as symptoms of cerebrovascular accident. This is a condition which results from hardening of the arteries. Decedent was hospitalized until June 13. During the hospitalization, a spinal tap *52 was performed. Decedent made a reasonably good recovery. He regained his speech and returned to work. In July 1962, decedent was hospitalized because of urinary problems. He was diagnosed as having a urinary tract obstruction due to an enlarged prostate gland. Prostate surgery was performed. Following the surgery, decedent developed numerous hemorrhages. Both the surgery and the hemorrhages led to a serious internal infection. The infection did not respond to medication and it led to an acute coronary thrombosis. This in turn caused an acute pulmonary edema, a fluid accumulation, in the the lungs. The edema caused decedent's death on September 10, 1962. There might have been some relation between decedent's high blood pressure and the ultimate cause of his death. Aside from this, there was no relationship between the cause of decedent's death and any prior disease or condition which he had had. Decedent probably experienced pain with the various ailments and disorders which he had during the last ten years of his life. He was, however, very reticent about himself - he never complained to his physician and would discuss his symptoms with him only after extended questioning. In *53 the presence of his physician, decedent's general attitude toward his illnesses was good - he did not appear depressed and did not display apprehension about death. The estate tax return for decedent's estate did not include in the gross estate either the 100 shares of common stock in Neilson corporation which decedent gave to Roman or the savings accounts which decedent transferred to the Louise trust. In his statutory notice of deficiency, respondent included both the value of the Neilson common stock and the corpus of the Louise trust in the gross estate. The ground for the inclusion was that decedent's gifts of these properties were in contemplation of death within the meaning of section 2035. Opinion The issue for decision is whether the value of 100 shares of common stock in Neilson corporation and of the balances of the Geneva, Syracuse, and Onondaga accounts, totaling $27,964.55, [6] is includable in decedent's gross estate under section 2035. The narrow question is whether decedent made gifts of these properties "in contemplation of death," within the meaning of section 2035(a). [7]
*54 The principles necessary to decide the question are set out in , as follows: Transfers in contemplation of death are included within the same category, for the purpose of taxation, with transfers intended to take effect at or after the death of the transferor. The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax. * * * As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be "contemplated," that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition. As a condition of body or mind that naturally gives rise to the feeling that death is near, that the donor is about to reach the moment of inevitable surrender of ownership, is most likely to prompt such a disposition to those who are deemed to be the proper objects of his bounty, the evidence of the existence or non-existence of such a condition at the time of the gift is obviously of great importance in determining whether it is made in contemplation *55 of death. * * *
There is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus give effect to the manifest purpose of the statute. Under section 2035(b), [8] there is a rebuttable presumption that gifts made within three years of death are in contemplation of death. Whether a petitioner has met the burden of overcoming the presumption is a question of fact to be determined from all the evidence in each case. . *56 Turning first to decedent's gift of Neilson corporation stock, we think petitioner has failed to meet its burden of proof. We reach this conclusion after a careful review of all the evidence bearing on the question. Petitioner argues that decedent's sole motive in making the gift was to induce Roman to remain in the business they had built together. It argues further that this is a motive associated with life, not death. It concludes that the gift was not in contemplation of death. We do not agree. We have found as a fact that at least one motive behind decedent's gift of the stock was a desire to keep the business from being split up. We do not, however, think petitioner has proved that this was decedent's sole or dominant motive. Indeed, the evidence tends to indicate otherwise. The record as a whole supports the inference that decedent had another motive - to make an essentially testamentary disposition of his Neilson corporation stock - and that this was the dominant motive. There are specific facts pointing in this direction. First, Roman was the natural object of this portion of decedent's bounty. Roman was decedent's step-son. Over a period of time, they had worked together *57 to build a business. It is natural to assume that decedent would have wanted Roman to own the business after decedent's death. Second, decedent did not provide for Roman in his will. From the record as a whole, it appears that Roman was closer to decedent than were his other children. Roman and decedent had daily contract in their business - a business in which the other children did not participate. Furthermore, Roman is a co-executor of decedent's estate and is the trustee with the major powers of the Louise trust. It appears that were it not for the gift of Neilson corporation stock decedent would surely have provided for Roman in his will. The absence of such a provision heightens the inference that the inter vivos stock gift was in lieu of a testamentary gift. Third, decedent wrote his will son after giving away his Neilson corporation stock. The temporal proximity of these events supports the inference that decedent was thinking in terms of a final disposition of his Neilson corporation stock during this time period. Finally, decedent experienced numerous illnesses and operations in the six years preceding the stock gift. During that time, he had four major operations and several *58 periods of sustained hospitalization. His physical condition at the time of the gift, coupled with his advanced age of 73, strengthens the inference that the dominant motive behind the gift was to make an essentially testamentary disposition of his stock. We attach little significance to the fact that decedent did not appear apprehensive about death to his physician. Petitioner would have us conclude from this that decedent was not in fact apprehensive about death. This, however, ignores the fact that decedent never complained about pain to his doctor, but yet the doctor testified that decedent must have experienced pain. We can only conclude from these facts that decedent was an unusually reticent man about his personal life. Nor do we attach significance to the fact that decedent's accountant did not discuss estate taxes with him. Petitioner would have us conclude from this that decedent did not discuss estate taxes with anyone. We note, however, that an attorney prepared the Louise trust and that an attorney witnessed decedent's will. The question arises whether decedent discussed estate taxes with an attorney. The record is silent as to the extent of decedent's contact with *59 attorneys during the times here relevant and as to whether he discussed estate taxes with them. In view of this, the fact that decedent did not discuss estate taxes with his accountant is of little value. The record as a whole fails to persuade us by a preponderance of the evidence that decedent's dominant motive in giving the Neilson stock was associated with life. Indeed, the specific facts which we discuss above support the inference that the dominant motive behind the gift was to make an essentially testamentary disposition. We, therefore, conclude that decedent's gift of the Neilson corporation stock was in contemplation of death. See (C.A. 2, 1934), where the Court of Appeals said: It is in just such a case as this, if death follows the material transfer within two [now three] years, that the presumption set up by the statute properly operates and the taxpayer must prove that the gift was not made in contemplation of death. The presumption of the statute can be overcome only by proof that the motive relied upon was on the facts associated with continued life and not equally with testamentary disposition *60 or by proof that the motive relied upon so motivated the donor that any other motive associated with testamentary disposition, which might be present, was merely an incident and not also a substantial motive for the settlement. Turning to decedent's creation of the Louise trust, we think petitioner has overcome the statutory presumption that the gift was in contemplation of death. We reach this conclusion after a careful review of all the evidence bearing on the question. To begin with, we accept petitioner's claim that decedent intended to irrevocably transfer money in trust for Louise when he opened the three savings accounts. Because Louise was mentally retarded, decedent believed she needed financial independence. To implement the belief and protect his daughter from eventualities, decedent made gifts of cash for her benefit. He never withdrew money from the accounts. He believed he had created trusts when he opened the accounts and be believed he had no right to the income they produced. Furthermore, we believe that decedent, when he later created the Louise trust, was motivated primarily by his accountant's advice concerning legal technicalities. The accountant advised *61 him that opening the savings accounts had not achieved his aim to create a trust to protect Louise. The accountant further advised him that a trust indenture settling an irrevocable trust would achieve his aim. Pursuant to the accountant's advice, decedent caused the trust indenture to be drawn and signed it. Because decedent created the Louise trust primarily in response to legal advice aimed at perfecting a transfer he had attempted years before, settling the trust merely finalized a long standing intent to protect Louise with a trust. Decedent originally manifested the intent in 1950 - 12 years before his death. At that time, decedent's desire to protect his retarded daughter with a trust would certainly have been characterized as a life motive. We do not think the characterization is affected by the later intervention of the accountant's advice concerning legal technicalities. When decedent acted on the advice, he was still motivated by his original desire to protect Louise with a trust. We therefore conclude that decedent's dominant motive in creating the trust was associated with life, not death. See Respondent argues that *62 in spite of decedent's long standing desire to protect Louise with a trust, the dominant motive behind the creation of the Louise trust was a desire to make a testamentary disposition. To support the argument, he points to facts such as decedent's age and physical condition when he created the trust. He also observes that decedent did not appoint himself as trustee and that he executed his will on the same day that he created the trust. We do not agree with the argument. As we indicate above, the question of whether a gift was made in contemplation of death is to be decided from all the evidence in each case. While the factors discussed on brief by respondent are relevant in deciding the question, we conclude from the record as a whole that decedent's dominant motive in creating the trust was to perfect his earlier transfer and thereby effectuate his long standing desire to protect Louise with a trust. We further conclude that this motive was associated with life, not death. We accordingly decide that his creation of the trust was not a gift in contemplation of death. We therefore hold that the value of the Neilson corporation stock is includable in decedent's gross estate under *63 section 2035, but that the value of the balances of the three savings accounts is not includable in his gross estate under section 2035. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. Sometime after decedent's death, Neilson corporation dropped the farm equipment line entirely.↩
3. The parties have stipulated that the value of 100 shares of Neilson corporation common stock on the date of decedent's death was $54,700.↩
4. The trust indenture was drawn by a firm of attorneys.↩
5. An attorney witnessed the will.↩
6. The notice of deficiency places a total value of $29,164.21 on these accounts. The stipulation of facts places the value at $28,864.55 without explaining the discrepancy. On brief, respondent concedes that $900 of this figure is not includable in the gross estate because it represents separate funds belonging to Louise. ↩
7. Section 2035(a) provides: SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule. - The value of the gross estate shall include the value of all property (except real property situated outside of the United States) to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.↩
8. Section 2035(b) provides: (b) Application of General Rule. -if the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment), but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.↩